IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

────────────────────────────────

ANTHONY BROWN,

                Plaintiff,

          v.

S. MEINECKE, *et al.*,

                Defendants.

Civil Action No.
9:12-CV-1720 (NAM/DEP)

────────────────────────────────

<u>APPEARANCES</u>:                    <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

ANTHONY BROWN, *Pro Se*
56283-019
Big Sandy U.S. Penitentiary
P.O. Box 2068
Inez, KY 41224

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNEIDERMAN    GREGORY J. RODRIGUEZ, ESQ.
New York State Attorney General   Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Anthony Brown, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, commenced this action against three employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution. Since the commencement of this action, plaintiff's claims have been narrowed to include a (1) First Amendment retaliation claim against defendant Lisa Andersen,[1] and (2) First Amendment free expression claim against defendants Andersen, Suzanne Meinecke,[2] and James Wilson.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint based on their

---

[1]     Plaintiff's complaint identifies the second-listed defendant as "Ms. Anderson." Dkt. No. 1 at 2. Defendants' motion papers, however, reveal that the correct spelling of this individual's name is "Lisa Andersen." *See, e.g.,* Dkt. No. 69-6. Accordingly the clerk is respectfully requested to adjust the court's records to reflect the correct spelling of defendant Andersen's name.

[2]     Plaintiff's complaint identifies the first defendant as "Ms. S. Meineck." Dkt. No. 1 at 1. Defendants' motion papers, however, reveal that the correct spelling of this individual's last name is "Meinecke." *See, e.g.,* Dkt. No. 69-7. Accordingly, the clerk is respectfully directed to adjust the court's records to reflect the correct spelling of defendant Meinecke's name.

contentions that (1) plaintiff failed to exhaust administrative remedies before commencing suit; (2) no reasonable factfinder could conclude, based on the record evidence, that defendants' actions were not prompted by a legitimate penological concern; and (3) all three defendants are entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion for summary judgment be granted and plaintiff's complaint be dismissed in its entirety.

I.     BACKGROUND[3]

Plaintiff is a prison inmate currently entrusted to the care and custody of the Federal Bureau of Prisons, a division of the United States Department of Justice. Dkt. No. 79. At the time of the events detailed in his complaint, plaintiff was a New York State prisoner designated to the Eastern Correctional Facility ("Eastern"), located in Napanoch, New York, and operated by the DOCCS. *See generally* Dkt. No. 1.

The events giving rise to plaintiff's claims are not materially disputed between the parties. *Compare* Dkt. No. 69-1 *with* Dkt. No. 75 at 5-11. On August 5, 2012, in the course of unpacking plaintiff's personal property in

_____

[3]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

the property room of the facility's special housing unit ("SHU"), defendant Meinecke, a corrections officer, confiscated approximately 1,300 pages of plaintiff's personal documents.[4] [Dkt. No. 1 at 5](), [Dkt. No. 69-7 at 2](). According to defendant Meinecke, she "found a drawing [in plaintiff's collection of papers] of a crown and the words 'Mail Call Kings,' which led [her] to suspect" plaintiff was connected with a gang called The Latin Kings. [Dkt. No. 69-7 at 2](). Defendant Meinecke also suspected, based on her review of the papers, that plaintiff was forming a business while incarcerated. *Id.* Based on her suspicions, she gave plaintiff's documents to defendant Andersen, a corrections sergeant at the time, "for a more thorough review." *Id.* According to plaintiff, he was not issued a contraband receipt. [Dkt. No. 1 at 7](); [Dkt. No. 75 at 2]().

Plaintiff filed a grievance on August 10, 2012, demanding a contraband receipt and return of his property. [Dkt. No. 1 at 7](); [Dkt. No. 75 at 79-80](). On August 13, 2012, plaintiff received a contraband receipt for his property following his refusal of all meals and mandatory visits with the prison psychiatrist. [Dkt. No. 1 at 8](); [Dkt. No. 75 at 38](). Plaintiff then wrote a

---

[4]     According to plaintiff, the seized materials included "three (3) original manuscripts, seven (7) original episodes of a television sitcom, an original screenplay, entrepreneurial plans and related correspondence." [Dkt. No. 1 at 5]().

letter to the Deputy Superintendent for Security complaining about the confiscation of his property. Dkt. No. 75 at 40-42. According to plaintiff, on August 15, 2012, his grievance was denied based on a memorandum from defendant Andersen to the grievance director. Dkt. No. 1 at 9, 14. In that memorandum, plaintiff was advised that a misbehavior report had been issued and he could voice his concerns regarding the "disposal of the paperwork deemed contraband" with the disciplinary hearing officer. *Id.* Plaintiff did not appeal that denial. Dkt. No. 75 at 3.

On August 16, 2012, plaintiff received a misbehavior report authored by defendant Andersen. Dkt. No. 1 at 9; Dkt. No. 75 at 50. Defendant Wilson, a corrections lieutenant at the time, presided over a disciplinary hearing conducted in connection with the misbehavior report on August 26, 2012, and found plaintiff not guilty of possessing contraband or gang material, but guilty of soliciting and violating facility correspondence rules. Dkt. No. 1 at 9; Dkt. No. 69-4 at 50; Dkt. No. 75 at 70, 86. Plaintiff conceded his guilt of the latter two charges, noting he had misinterpreted a memorandum from Deputy Commissioner Lucien LeClaire regarding those practices. Dkt. No. 75 at 3. Defendant Wilson ordered that the property be

"mailed home, donated, or destroyed."[5] Dkt. No. 69-4 at 50; Dkt. No. 75 at 70, 86. Plaintiff mailed the papers to an acquaintance, who later informed him that "there were a number of pages missing."[6] Dkt. No. 1 at 9-10; Dkt. No. 75 at 4, 48.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on November 21, 2012, by the filing of a complaint and application to proceed *in forma pauperis* ("IFP"). Dkt. No. 1. Named as defendants in plaintiff's complaint are (1) Suzanne Meinecke, a Corrections Officer at Eastern, (2) Lisa Andersen, a former Corrections Sergeant and now Corrections Lieutenant at Eastern; and (3) James Wilson, a former Corrections Lieutenant at Eastern. *Id.* Plaintiff's complaint asserts four causes of action, alleging violations of the First, Eighth, and Fourteenth Amendments. *Id.*

In a decision and order issued by Senior District Judge Norman A. Mordue on April 11, 2013, plaintiff was granted leave to proceed IFP, and

_____

[5]    Defendant Wilson also sentenced plaintiff to thirty days of disciplinary special housing unit confinement and a corresponding loss of privileges. Dkt. No. 69-4 at 50; Dkt. No. 75 at 70, 86. These aspects of plaintiff's sentence were deferred for ninety days. *Id.*

[6]    Specifically, the recipient of plaintiff's documents advised that they "were in an organized condition, but there was [sic] pages missing according to the number sequences." Dkt. No. 75 at 48.

two of plaintiff's claims were dismissed, *sua sponte*, for failure to state a claim upon which relief may be granted in accordance with 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b). *See generally* Dkt. No. 12. The claims that remain in the action consist of (1) a First Amendment retaliation claim asserted against defendant Andersen, and (2) a First Amendment free expression claim asserted against defendants Meinecke, Andersen, and Wilson. *Id.*

III.   DISCUSSION

    A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Andersen*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Andersen*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Andersen*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Andersen*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Andersen*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Andersen,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Plaintiff's Retaliation Claim

In support of their motion, defendants seek dismissal of plaintiff's retaliation claim asserted against defendant Andersen based on Brown's failure to exhaust available administrative remedies prior to filing this lawsuit.[7] [Dkt. No. 69-9 at 4-9](Dkt. No. 69-9 at 4-9).

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section

---

[7]     Defendants do not contend that plaintiff failed to exhaust administrative remedies in connection with the free expression claims.

1983.").[8] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).[9]

---

[8]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[9]    While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

The DOCCS has instituted a grievance procedure, referred to as the Inmate Grievance Program ("IGP"), and made it available to its inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision

within a certain number of days after receipt of the grievant's appeal.[10] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

As can been seen, at each step of the IGP process, a decision must be rendered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)). Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See*

---

[10]     Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(i), (ii).

*Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In this case, although plaintiff's complaint alleges that he filed and appealed two grievances regarding the confiscation and alleged destruction of his property, both defendants' submissions in support of their motion and plaintiff's own admissions demonstrate that he failed to file a grievance accusing defendant Andersen of retaliation. Plaintiff alleges he submitted a grievance "to the IGRC in addition to a hunger strike to protest what [he] viewed as a capricious confiscation." Dkt. No. 75 at 2, 79-80; *see also* Dkt. No. 1 at 7. A review of that grievance, however, reveals that Brown did not complain of retaliation by defendant Andersen. Dkt. No. 75 at 79-80. A second potentially relevant grievance was allegedly filed by plaintiff while confined in the Cayuga Correctional Facility ("Cayuga") on September 24, 2012.[11] Dkt. No. 1 at 10. Thomas Napoli, the Inmate Grievance Supervisor at Cayuga, however, states that "[t]here is no record that Brown filed a grievance on September 24, 2012[.]" Dkt. No. 69-8 at 3. The absence of this

---

[11]     According to plaintiff, he was transferred from Eastern to Cayuga on August 31, 2012. Dkt. No. 75 at 4.

grievance is explained by plaintiff, who, in his response to defendants' motion, states that, as a result of being "mentally stressed and frustrated, [he] neglected to sign the grievance," and it was consequently "procedurally dismissed[.]" Dkt. No. 75 at 4. Accordingly, there appears to be no dispute among the parties that plaintiff failed to file a grievance with respect to his retaliation claim against defendant Andersen.

While the record firmly establishes that plaintiff did not fulfill his obligation to exhaust available administrative remedies, this fact alone does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g*, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias v. Zenk*, 495 F.3d 37, 41 (2d Cir. 2007). Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of

non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements.

In this instance, there is no record evidence to suggest that the IGP was not fully available to the plaintiff in this matter. Indeed, the copies of plaintiff's grievances and the records attached to the declaration submitted by Jeffrey Hale, the DOCCS Assistant Director of the IGP, demonstrate that, during his custody by the DOCCS, the IGP was available to plaintiff and he accessed the grievance process on at least one other occasion. Dkt. No. 75 at 79-80, 99-100; Dkt. No. 69-5 at 7. Turning to the second inquiry, there is no record evidence that suggests defendants forfeited the exhaustion defense, and plaintiff has not alleged as much.[12] Finally, nothing in the record suggests that special circumstances exist that could justify plaintiff's failure to exhaust the available administrative remedies.

_____

[12]     Defendants asserted the exhaustion defense in their answer. Dkt. No. 36 at 3.

Accordingly, because I find no reason to conclude that plaintiff should be excused from the exhaustion requirement, I recommend that his retaliation claim be dismissed on this procedural ground.

C.   Qualified Immunity

In their motion, defendants argue that even if plaintiff's claims have merit, which they do not concede, defendants are entitled to qualified immunity and the claims asserted against them should be dismissed on that basis.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their

conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223 (2009)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, "whether that right was 'clearly established' at the time of the events at issue." *Nagle v. Marron*, 663 F.3d 100, 114 (2d Cir. 2011); *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014) (citing *Saucier*, 533 U.S. at 201). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal

quotation marks and alterations omitted). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

With respect to the first inquiry, the Second Circuit has cautioned that courts "should define the constitutional right with some specificity." *See Lewis v. Cowen*, 165 F.3d 154, 167 (2d Cir. 1999) (concluding that the district court too broadly identified the right in question as "freedom of expression"). Mindful of this guidance, while the broader constitutional right at issue in this case is free expression under the First Amendment, for purposes of the present qualified immunity analysis, I have more narrowly construed the right at issue to be maintaining personal writings while incarcerated that are not incompatible with prison security.

Assuming this right was clearly established at the time of defendants' conduct in this case, under the circumstances, I conclude that it was

objectively reasonable for them to believe their actions were lawful. Both defendants Meinecke and Andersen state it was their belief that plaintiff possessed gang-related material, posing a threat to the security of the prison, and violated prison rules regarding correspondence and solicitation. Dkt. No. 69-6 at 2; Dkt. No. 69-7 at 2, 3. In the end, they were correct that some of the materials violated prison regulations, and plaintiff admitted as much by pleading guilty to two of the charges lodged in defendant Andersen's misbehavior report. Dkt. No. 69-4 at 2, 13, 42-43. Accordingly, it was reasonable for defendants Meinecke and Andersen to believe their conduct did not violate plaintiff's rights.

As for defendant Wilson, he ordered plaintiff to discard or send home his personal writings, which Brown had admitted at the disciplinary hearing violated prison regulations. Dkt. No. 69-4 at 13, 42-43. Defendant Wilson believed that this disposition was authorized by state regulations, including 7 N.Y.C.R.R. § 254 and DOCCS Directive 4910A. *Id.* at 3. Defendant Wilson's assertion that his actions were in conformity with a state regulation may lend support to his claim that he acted reasonably with respect to plaintiff's constitutional rights. *Green v. Bauvi*, 46 F.3d 189, 195 (2d Cir. 1995). Section 254 permits a hearing officer to restrict an inmate's correspondence "where the inmate has been involved in improper conduct

in connection with correspondence with [a particular person]." 7 N.Y.C.R.R. § 254(a)(1)(ii). DOCCS Direction 4910A authorizes a hearing officer to dispose of "'general' contraband pertinent to a disciplinary proceeding" at his discretion. Dkt. No. 69-4 at 3. Under these circumstances, where plaintiff had admitted his writings violated certain prison regulations and defendant Wilson was provided discretion with respect to the disciplinary hearing's disposition, it was reasonable for defendant Wilson to believe that he was not violating plaintiff's rights by instructing him to discard or send home his writings.

Because I find defendants Meinecke, Andersen, and Wilson are entitled to qualified immunity from suit, I recommend that plaintiff's First Amendment claims against each of them be dismissed.

IV.  SUMMARY AND RECOMMENDATION

Now that discovery in this case is complete, defendants have moved for summary judgment in their favor. With regard to plaintiff's First Amendment retaliation claim, through his own admissions, it is clear that plaintiff failed to exhaust the administrative remedies available to him and, finding no basis to excuse that failure, I recommend that this claim be

dismissed. Turning to plaintiff's First Amendment free expression claim, because it was reasonable for defendants to believe that they did not violate plaintiff's right to maintain his personal writings under the circumstances, I recommend a finding that they are entitled to qualified immunity from suit. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 69) be GRANTED and all remaining claims set forth in plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:    February 24, 2015
          Syracuse, New York


Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005)* (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

### (3)

### Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Thus, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

FN1. The following facts are taken from
Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ☞ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996. FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.*, 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See*, Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See*, *Toliver v. County of Sullivan*, 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack*, 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds*, 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g.*, *Forster v. Bigger*, 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers*, 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers*, 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin*, 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

***ORDER and REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

### B. Defendants' Counterclaim

**\*2** In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.'

Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

## II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at *3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

### III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,<sup>FN1</sup> the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.<sup>FN2</sup>

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." <sup>FN3</sup> The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." <sup>FN4</sup> Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <sup>FN5</sup>

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true <sup>FN6</sup> to the extent that (1) those facts are supported by the evidence in the record,<sup>FN7</sup> and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.<sup>FN8</sup>

> FN6. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontrovered record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at \*3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at \*3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at \*2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions,[FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No.002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.[FN26] However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting)[FN27] that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.FN28 (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Aff. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified"* of the prisoner's injured arm-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

**\*12** Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained in Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at \*27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at \*24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

**C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

FN35. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

FN39. (*Id.*)

FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

> FN42. 42 U.S.C. § 1997e.

> FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

> FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

> FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

[FN54.] (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

[FN55.] (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminately [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

> FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims. [FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.")[FN63]

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> **FN64.** *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED* in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED* in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.